**Frederick A. SIEGERT, Plaintiff,**

v.

**H. Melvyn GILLEY, Defendant.**

**Civ. A. No. 86–3234.**

United States District Court,
District of Columbia.

June 30, 1988.

---

Nina Kraut, Washington, D.C., for plaintiff.

John M. Facciola, Asst. U.S. Atty., District of Columbia, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This case involves a claim by a clinical psychologist who was formerly employed at Saint Elizabeth's Hospital and is now working as a librarian in Germany. Plaintiff claims that defendant deprived him of his due process rights and he has brought this action pursuant to the Fifth Amendment of the Constitution and the *Bivens* doctrine. He has also invoked the pendent jurisdiction of this court for his common law claims of defamation, intentional infliction of emotional distress and interference with contractual relations.

Plaintiff filed this lawsuit on November 25, 1986, slightly less than a year after he discovered allegedly defamatory communications between defendant and officials at his new place of employment had caused him to lose his new job. The theory of plaintiff's constitutional claim is that defendant's publication of defamatory remarks led not only to severe harm to his reputation but also caused an infringement of his "liberty interests" in violation of the protections provided by the due process clause of the Fifth Amendment to the United States Constitution. Plaintiff seeks damages under the principles first expounded in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Defendant made a motion to dismiss the action, or in the alternative, for summary judgment, on several grounds, including the contention that even accepting his factual allegations, plaintiff had failed to show an infringement of any right protected by the Constitution. Defendant also asserted that the doctrines of qualified immunity and absolute immunity protect him against liability for any of plaintiff's claims. After hearing oral argument, I determined that because plaintiff had not obtained any discovery, the record was insufficiently developed to permit either dismissal or summary judgment. I found that a sharply circumscribed amount of discovery was warranted. Accordingly, I ordered the parties to take the testimony of the two principal actors in this affair—plaintiff, Dr. Siegert, and defendant, Dr. Gilley.

This case is now before me on defendant's Motion for Reconsideration and for a Stay of Discovery Pending Resolution of Defendant's Immunity Claim. Defendant urges me to reconsider my December 3, 1987 Order for a number of reasons. Defendant's core contention is that by ordering depositions before making a final determination on his motion for summary judgment:

> the Court, in a manner that is, we submit, contrary to the established method in this Circuit of resolving immunity claims in *Bivens* cases, ordered discovery which neither party sought in a case with undisputed facts. We respectfully submit that the Court clearly erred by conditioning the resolution of the defendant's motion for summary judgment, based on his immunity, on the parties's engaging in discovery when the fundamental facts bearing on Dr. Gilley's immunity were not in dispute.

Memorandum of Points and Authorities in Support of Defendant's Motion for Reconsideration and for a Stay of Discovery Pending Resolution of Defendant's Immunity Claim (hereinafter "Defendant's Brief for Reconsideration") at 5. After careful consideration of defendant's motion, I have

determined, as I did before, that his motion to dismiss, or in the alternative, for summary judgment, must be denied at this time. Despite defendant's insistence that "the court must resolve the motion for summary judgment before permitting any discovery," I reiterate that I am willing to hear renewed motions for summary judgment by either party after the completion of discovery.

## THE FACTS

For the purposes of defendant's motion, the truth of the allegations in the complaint and plaintiff's supporting materials must be taken as true, and any ambiguities or uncertainties concerning the sufficiency of the claim must be resolved in favor of the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Paul v. Davis*, 424 U.S. 693, 720, 96 S.Ct. 1155, 1169–1170, 47 L.Ed.2d 405 (Brennan, J. dissenting); *Walker Process Equipment Inc., v. Food, Machinery & Chemical Corp.*, 382 U.S. 172, 174–175, 86 S.Ct. 347, 348–349, 15 L.Ed.2d 247 (1965); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985); *Sinclair v. Kliendienst*, 711 F.2d 291, 293 (D.C.Cir. 1983). Although the defendant has labelled his motion one either for summary judgment or to dismiss, he has not put into evidence any affidavits which would contradict the substantive facts set forth by plaintiff.[1] I must therefore treat the facts alleged by plaintiff as admitted, as I would on a motion to dismiss. As the Supreme Court has asserted, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–102; *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980).

The following allegations by plaintiff therefore must be accepted as the relevant facts for purposes of this motion:

According to plaintiff, he was employed as a clinical psychologist at St. Elizabeth's Hospital, Washington, D.C. ("St. E's"), for approximately six years prior to his resignation on October 1, 1985. Defendant was plaintiff's immediate supervisor at St. E's for the year immediately preceding plaintiff's departure from St. E's.

Plaintiff resigned from St. E's mainly because of long-standing personal and professional differences with defendant. Prior to his professional relationship with the defendant, plaintiff received exemplary job performance ratings from his supervisors.

In early September, 1985, plaintiff received advanced notice from St. E's that he was going to be terminated from his position at the Hospital. The termination was due, at least in part, to plaintiff's conflicts with the defendant. In September, plaintiff met with officials at the Hospital and reached an agreement that if he resigned from his position, a letter of removal would not appear in his personnel file. In reaching such an agreement, plaintiff sought to protect his future job prospects and his good standing in his professional community. On October 1, 1985, pursuant to the agreement, plaintiff resigned from his position at St. E's.

Concurrent with his removal/resignation from St. E's, plaintiff was in the process of obtaining a position as a clinical psychologist at the United States Army Medical Department Activity ("USAMDA") in Bremerhaven, West Germany. He was seeking a position for personal reasons—he wanted to re-join a woman with whom he had a relationship and who lived there.

On or about August 30, 1985, plaintiff entered into a 36 month contract with USAMDA to work as a clinical psychologist in the Exceptional Family Member Program

---

1. Plaintiff has placed into evidence his own affidavit, which relates the facts recounted below. Defendant has placed into evidence an affidavit by Dr. Eugene Stammeyer, the Director of Psychology at St. Elizabeths Hospital. Dr. Stammeyer's affidavit is largely devoted to explaining the process whereby Dr. Gilley was asked to respond to the inquiry about Dr. Siegert's credentials. Aside from a brief reference to the circumstances under which Dr. Siegert departed from St. E's, Dr Stammeyer does not address the truth or falsity of Dr. Gilley's letter.

in Bremerhaven. His duties were to consist primarily of working with children on an out-patient basis. He also would work with members of the children's families. Plaintiff had considerable experience working with children in the past, both at St. E's and in other former positions. Working with children is plaintiff's area of specialty and expertise and he has trained other counselors in areas relating to child development and behavior therapy.

A condition of plaintiff's employment with the Department of the Army is that he be "credentialed" as to the treatment of children and, independently, as to the treatment of adults. Although the record is neither clear nor developed as to the actual meaning of "being credentialed" in the profession of psychology, it appears that a psychologist must be credentialed for certain professional activities by any given hospital before he or she can be permitted to practice in those areas.[2] In this case, pursuant to both the common practices of the profession, and specific Army regulations, plaintiff could only work professionally with children at USAMDA in Bremerhaven *after* he received his credentials from the Hospital there for working with children. The same was true for working with adults.

Plaintiff was credentialed to work with both children and adults at St. E's. Because he had been credentialed at his former hospital and because of his extensive experience and expertise working with children, plaintiff expected that he would obtain his credentials in Bremerhaven without any difficulty.

In mid-October, 1985, William R. Smith, Jr., LTC, MC, Deputy Commander for Clinical Services and Chairperson of the Credentials Committee at the USAMDA, contacted St. E's to obtain credentials information about plaintiff. He spoke with defendant, Dr. Gilley. The content of their discussion would appear to be quite important. Although we do not know what was said, the conversation was followed by a letter, on October 23, 1985, which according to plaintiff, made totally false and unsubstantiated allegations about the plaintiff. This letter has been submitted under seal by defendant. I have examined the letter *in camera*. While I am not lifting the seal at this time, if the plaintiff is correct that the statements contained in the letter are false and misleading, they would tend to give rise to a cause of action as plaintiff contends. In the letter, Dr. Gilley accuses the defendant of being inept, unethical, and untrustworthy among other things. Plaintiff claims these accusations are untrue and are totally inconsistent with the fact that he received exemplary job performance ratings from his superiors for five years. It is clear that at some point in this case, the substance of the letter and plaintiff's employment record will have to be reconciled.

According to plaintiff, as a result of the information provided to Colonel Smith by defendant, plaintiff was denied his credentials by USAMDA for working with children. Plaintiff was informed by Colonel Smith that the reports they received about him from St. E's were "extremely unfavorable" and that the Credentials Committee therefore recommended that he not be credentialed. The decision to deny plaintiff his credentials was appealed by plaintiff. Plaintiff recently learned that his appeal had been denied. *See* Plaintiff's Opposition to Defendant's Motion for Reconsideration and for a Stay of Discovery Pending Resolution of Defendant's Immunity Claim

---

2. According to plaintiff, who in turn is relying on the opinion of Dr. Russell Newman, the Director of Legal and Regulatory Affairs for the Practice Directorate of the American Psychological Association:

"credentialing" is synonymous to "privileges" that are granted by a hospital's own medical staff or board. For example, if a person has a particular specialty, he or she is granted particular privileges in conformity with that specialty's standards or criteria for practice which have been established by the hospital's board, such as educational standards, years of practice and type and quality of supervision received. Once granted, "some element" of due process has to be adhered to by the board ... if the credentials are to be later revoked. Plaintiff's Opposition to Defendant's Motion for Reconsideration and for a Stay of Discovery Pending Resolution of Defendant's Immunity Claim (hereinafter "Plaintiff's Opposition") at 2, n. 2.

(hereinafter Plaintiff's Opposition") at 2, n. 1.

Because of the difficulty in obtaining credentials that he was experiencing at the hospital in Bremerhaven, plaintiff applied in the Summer of 1986 for a psychologist position at an Army base in Stuttgart. He obtained a position and reported for work on July 28, 1986. He "was literally turned away and was told that [he] was not wanted because of what they had heard about me from Bremerhaven personnel." *See* Siegert Affidavit at 5.

In September, 1986, plaintiff's credentials as to both adults and children were provisionally granted. Shortly thereafter, however, his credentials for treating children were revoked and he was involuntarily released from employment. Plaintiff brought this suit in November, 1986. Plaintiff was assigned to work in the medical library of the Army hospital at Bremerhaven until the resolution of several pending appeals of credentialing decisions. During the pendency of those appeals and this lawsuit, plaintiff "has been unable to find even remotely comparable employment." Plaintiff's Opposition at 2, n. 1.

ANALYSIS

Plaintiff's basis for bringing suit in this federal court is his *Bivens* claim that Dr. Gilley's publication of defamatory information through both a letter and a telephone call to his new employers deprived him of a constitutionally protected liberty interest. The other four counts in plaintiff's complaint merely state common law claims which are only appropriate for adjudication in this court if they are pendent to a surviving federal claim. *See generally United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Defendant contends that "the facts set out in plaintiff's complaint establish an allegation of only the common law tort of defamation, and do not properly allege a violation of his constitutional rights pursuant to *Bivens v. Six Unknown Named*

*Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)." Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss or for Summary Judgment (hereinafter "Defendant's Brief") at 4. Defendant also contends that even if plaintiff has properly alleged a constitutional *Bivens* action, Dr. Gilley is clothed with qualified immunity which shields him from liability unless his conduct violated the standards laid down in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Closely related threshold inquiries are involved in determining whether plaintiff has made out an acceptable *Bivens* claim and whether defendant's qualified immunity requires dismissal of that claim. On the facts presented in this case, if plaintiff satisfies the *Harlow* standard he will necessarily make out a colorable *Bivens* claim. I therefore turn directly to the issue of qualified immunity.

Justice Powell, writing for the majority in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), set forth the standard for qualified immunity when he stated:

... government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* 102 S.Ct. at 2738. Hence, when faced with either a motion to dismiss or a motion for summary judgment which rests upon a claim of qualified immunity, I must:

determine not only the currently applicable law, but whether the law was clearly established at the time the action occurred. *Harlow v. Fitzgerald,* 102 S.Ct. at 2738 (footnote omitted). If the law was not clearly established, the defendant will prevail on summary judgment on the basis of the qualified immunity defense, *id.* [457 U.S.] at 821 [102 S.Ct. at 2739–2740] (Brennan, J. concurring). If, on the other hand, the applicable law was clearly established, then, as the Court noted in *Harlow,* it should have been

known to "a reasonably competent public official," and the qualified immunity defense "should ordinarily fail" unless the defendant "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard."

*Czurlanis v. Albanese,* 721 F.2d 98, 108 (3d Cir.1983) (quoting *Harlow*).[3] As the Supreme Court recently asserted, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action," *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow*), "assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.*

The Supreme Court also has provided recent guidance in applying the *Harlow* standard to specific facts and legal rules. The Court instructs:

> The operation of [the Harlow] standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow* ... The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *see also Martin v. Malhoyt,* 830 F.2d 237,

253 (D.C.Cir.1987). The Court of Appeals for the District of Columbia has provided the further guidance that:

> Consistent with the *Anderson v. Creighton* Court's emphasis on the "particularized" manner in which the immunity inquiry is to be undertaken, "we subject damage actions against government officials to a heightened pleading standard," *Smith v. Nixon,* 807 F.2d 197, 200 (D.C. Cir.1986), wherein plaintiffs must, at the very least, specify the "clearly established" rights they allege to have been violated with "sufficient[ ] precis[ion] to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds." *Hobson v. Wilson,* 737 F.2d 1, 29 (D.C.Cir.1984).

*Martin, supra,* 830 F.2d at 253 (D.C.Cir. 1987); *see also Ellsberg v. Mitchell,* 807 F.2d 204 (D.C.Cir.1986); *Halperin v. Kissinger,* 807 F.2d 180 (D.C.Cir.1986).

However, despite the Supreme Court's instruction that lower courts focus on the contours of the right as applied to the specific facts in a given case, and the Circuit Court's requirement that a heightened pleading standard be applied in the context of a qualified immunity inquiry, the Supreme Court has also emphasized that "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson v. Creighton,* 107 S.Ct. at 3039; *Mitchell v. Forsyth,* 472 U.S. 511, 535, n. 12, 105 S.Ct. 2806, 2820, n. 12, 86 L.Ed.2d 411 (1985). Finally, when scrutinizing a claim against the *Harlow* standard, it must be kept in mind that when government officials violate the law, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow, supra,* 457 U.S. at 814, 102 S.Ct. at 2736.

 In this case, the threshold immunity question is whether it was clearly established in late 1985 that plaintiff had a

---

3. As defendant points out, "until this threshold immunity question is resolved, discovery should not be allowed." *Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).

liberty interest of which defendant deprived him. Stated in more specific terms, I must determine whether Dr. Siegert's loss of employment at the Bremerhaven hospital and his inability to obtain his credentials as a result of the allegedly defamatory communications made by defendant involves the violation of a concrete, specific "liberty interest" within the protection of the due process clause of the Fifth Amendment.[4] A careful review of the case law leaves little question that plaintiff's clearly established constitutional rights were violated by defendant's conduct. Defendant's contentions to the contrary are based both on a refusal to accept as true the facts alleged by plaintiff,[5] and an inappropriately narrow understanding of the breadth of plaintiff's constitutional liberty interests as recognized by the D.C. Circuit in 1985.

Defendant contends that this case is controlled by *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) and *Mosrie v. Barry*, 718 F.2d 1151 (D.C.Cir.1983).[6] The facts in this case, however, are readily distinguishable from the facts in those cases. The events set forth by plaintiff in this case are much more similar to the underlying facts in *Doe v. United States Dept. of Justice*, 753 F.2d 1092 (D.C.Cir. 1985) (finding violation of constitutionally protected liberty interests of attorney discharged by Department of Justice amidst charges of dishonesty) and *Bartel v. F.A.A.*, 725 F.2d 1403 (D.C.Cir.1985) *on remand* 617 F.Supp. 190 (D.D.C.1985).

In *Paul v. Davis*, plaintiff was arrested for shoplifting and local police chiefs posted him as an "active shoplifter" in a flyer circulated to hundreds of merchants. After the charges against him were dropped, plaintiff sued the police for violation of his constitutional rights under 42 U.S.C. § 1983. The plaintiff in *Paul* was neither a government employee nor an applicant for a government job. His sole claim for relief was for harm to his reputation. The Supreme Court characterized the question presented in *Paul* as "whether respondent's charge that petitioner's defamation of him, standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment." 424 U.S. at 694, 96 S.Ct. at 1157. The Court concluded that it did not and held that defamation alone is not enough to give rise to a due process right; "other governmental action" is required.[7] The

---

**4.** The same standard for determining deprivations of liberty without due process of law applies under the Fifth and the Fourteenth Amendments. *See Paul v. Davis*, 424 U.S. 693, 702, n. 3, 96 S.Ct. 1155, 1161, n. 3, 47 L.Ed.2d 405 ("If ... defamation by a state official is actionable under the Fourteenth Amendment, it would of course follow that defamation by a federal official should likewise be actionable under the cognate Due Process Clause of the Fifth Amendment."); *see also Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1105, n. 13 (1985).

**5.** For instance, defendant asserts that "plaintiff's constitutional tort action must be dismissed because plaintiff cannot possibly establish that at the time Dr. Gilley wrote the letter the law was clearly established that writing a letter about a former employee to his prospective employer which is allegedly defamatory in response to the former employee's request that his new employer be provided with all information about the employee's job performance subjects the former employee to a deprivation of his liberty without due process of law." *See* Defendant's Supplemental Memorandum at 5. Defendant's sharply slanted characterization of the facts and distortion of the nature of the constitutional right at

issue in this case is useless for purposes of considering plaintiff's motion to dismiss. Although plaintiff must meet a heightened pleading standard, he still retains the discretion to choose the constitutional right which he contends has been violated.

**6.** Defendant, for instance, asserts that: "The decisions in *Paul v. Davis, supra* and the cases that follow it are clearly dispositive of plaintiff's attempt to allege a constitutional violation in the present case. Acts by government officials which are claimed to harm a person's reputation and his future earning capacity do not constitute a violation of any right protected by the Constitution." Defendant's Brief at 6. Of course, as discussed above, plaintiff has alleged significantly more than merely harm to reputation and resultant harm "to future earning capacity." He has set forth specific government jobs which he has lost and he has alleged the foreclosure of the opportunity to obtain government positions in his profession in the future.

**7.** Similarly, Judge Bork pointed out in *Mosrie v. Barry*, 718 F.2d 1151, 1158 (D.C.Cir.1983) that, "Indeed, in explaining that harm to reputation is not a deprivation of liberty, the Court [in *Paul v.*

Court, well aware of the "frequently drastic effect of the 'stigma' which may result from defamation by the government," *id.* 424 U.S. at 701, 96 S.Ct. at 1160–1161, held that proof of damages does not meet that requirement.

Rather, the *Paul* Court required some tangible alteration of "status" in addition to an injury in reputation to make out a cognizable liberty interest. This requirement has become popularly known as the "reputation plus" standard. *See Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1107 (D.C.Cir.1985). Whereas the plaintiff in *Paul* failed to allege any harm to specific employment opportunities, Dr. Siegert has alleged both the loss of a specific position (Bremerhaven) and the denial of another specific opportunity for governmental employment (Stuttgart). Dr. Siegert, moreover, has alleged a permanent change in status due to his inability to obtain credentials to work with children. Because of that change in status, he "was wrongfully denied the right to be considered for government [employment] in common with all other persons." *Mosrie,* 718 F.2d at 1161. Plaintiff, a career psychologist, who is presently working as a librarian, has alleged that he may never be able to obtain another government position as a psychologist and that his ability to practice his profession has been destroyed. Accepting these allegations as true, defendant's actions have undoubtedly imposed a "stigma" on Dr. Siegert that has foreclosed his freedom to take advantage of other employment opportunities. *See Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). Unlike the plaintiff in *Paul,* Dr. Siegert has alleged much more than "mere" harm to reputation. *Paul* is therefore inapposite.

Defendant's reliance on *Mosrie v. Barry,* 718 F.2d 1151 (D.C.Cir.1983) and *Shewmaker v. Minchew,* 504 F.Supp. 156 (D.D.C. 1980), *aff'd* 666 F.2d 616 (D.C.Cir.1981) is similarly misplaced. In *Mosrie,* the D.C. Circuit narrowly held that an individual cannot claim a violation of his or her constitutional rights when he or she is merely laterally transferred:

> The harms suffered by appellant in this case do not meet the *Paul v. Davis* requirement of loss of a government position or change in legal status. Appellant was merely transferred laterally ... To find the lateral transfer a deprivation would be inconsistent with *Paul v. Davis*'s repeated emphasis on "loss of government employment."

*Mosrie,* 718 F.2d at 1161. Because the *Mosrie* plaintiff's "management responsibilities, duties and promotional potential after his transfer [were] comparable to those before" the transfer, *Mosrie* is easily distinguishable from this case. Similarly, in *Shewmaker,* the plaintiff was first demoted, but was subsequently reinstated, by a successful administrative challenge, to his original position. Dr. Siegert, obviously, has not been reinstated. Both *Mosrie* and *Shewmaker* involved situations where the government injured the plaintiff's reputation, but in so doing, failed to effect "a removal, extinguishment, or significant alteration of an interest recognized and protected by ... law." *Mosrie,* 718 F.2d at 1160–61. Unlike Dr. Siegert, neither the plaintiff in *Mosrie* nor the plaintiff in *Shewmaker* lost their job. Moreover, neither lost what amounts to their right to continue practicing their profession.

Although *Paul* and *Mosrie* do not control the outcome of this case, those cases make it clear that in order for plaintiff to establish that the government has deprived him of a constitutionally protected liberty interest, he must "demonstrate that the government's defamation resulted in a harm to some interest beyond reputation." *Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1111 (D.C.Cir.1985). According to the D.C. Circuit's decisions in *Doe* and *F.A. A. v. Bartel,* 725 F.2d 1403 (D.C.Cir.1984), both of which were decided prior to the occurrence of the events at issue in this

---

*Davis* ] quoted Justice Reed from *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951): the defamation may be 'hurtful to [the plaintiffs'] pres- tige, reputation and *earning power*' but nonetheless does not deprive them of a fifth amendment liberty."

case, "[l]oss of present or future employment, however, satisfies that required additional interest." *Doe*, 753 F.2d at 1111. In this case, Dr. Siegert meets that requirement because he lost both his present job (Bremerhaven) and a specific future job (Stuttgart) because of defendant's defamation.

*Doe* involved an action brought by a former Department of Justice (DOJ) attorney against the Department and various DOJ officials. The plaintiff was discharged from her position as a DOJ attorney amidst charges of unprofessional conduct and dishonesty. After unsuccessfully seeking an administrative name-clearing hearing, the plaintiff sued in federal court, seeking reinstatement, back pay and other appropriate relief from the Department; she sought money damages from the individual defendants. *Doe*, 753 F.2d at 1095. Although the D.C. Circuit affirmed the dismissal of plaintiff's *Bivens* action against the individual DOJ defendants on statute of limitations grounds, *Id.* 753 F.2d at 1114–15, the court found that she had asserted a constitutionally protected liberty interest against the Department. *Doe*, 753 F.2d 1102–1114. Government action had both caused plaintiff to lose her job and placed a "stigma" on her. The court found her liberty interests had therefore been violated.

In reaching that conclusion, the D.C. Circuit articulated a number of principles which bear directly on whether or not Dr. Siegert has set forth a constitutionally protected liberty interest. First of all, the *Doe* court found that government defamation accompanied by the loss of government employment would support a liberty interest claim. The court stated:

> *Paul* explicitly recognized that the *combination* of government defamation plus the failure to rehire or the discharge of a government employee states a liberty interest claim even if the discharge itself deprives the employee of no property interest protected by the fifth or fourteenth amendments ... "it is the individual's status as a government employee and not his property interest in continued employment which furnishes the 'plus'

that raises reputation to the level of a constitutionally protected liberty interest."

*Doe*, 753 F.2d at 1106–07 (citations omitted) (emphasis added). In addition, the *Doe* court went to great lengths to make it clear that Doe, who like the plaintiff in *Roth* was not a "protected" government employee, need not enjoy "protected status" in continued government employment in order to state a liberty interest claim. Rather, the court emphasized that, "a discharge from government employment satisfies *Paul*'s 'reputation plus' requirement *regardless* of whether the employee can point to any independent property interest in continued employment." *Doe*, 753 F.2d at 1109 (emphasis added).

Therefore, a common law defamation is transformed into a constitutional deprivation of liberty when the government is the source of the defamatory allegations and the resulting "stigma" involves "some tangible change of status vis-a-vis the government." *Doe*, 753 F.2d at 1108–09. Under *Doe*, the fact that Dr. Siegert may have possessed no *Roth* property interest in either his original position at St. E's or in his positions in Germany does not interfere with his invocation of a liberty interest when government defamation causes his loss of employment and a change in his legal status.

A little less than two years before the events in this case occurred, the D.C. Circuit, in *Bartel v. F.A.A.*, 725 F.2d 1403 (D.C.Cir.1984), addressed a factual situation which closely parallels the facts in this case and which foreshadowed the principles enunciated in *Doe*. In that case, Bartel, an air safety inspector for the Eastern Region of the FAA, was accused of certain Privacy Act violations. After an investigation, Brian Vincent, the Chief of the FAA Eastern Region Flight Standards Division, decided that a letter of reprimand to Bartel was appropriate. No such letter was ever issued, however, because Bartel left the FAA for employment elsewhere before the adverse action became official. Slightly less than a year after his departure, Bartel applied for a job with the Southern Region

of the FAA. When Vincent learned that Bartel was seeking a position with the Southern Region, he wrote an allegedly defamatory letter about Bartel and the Privacy Act accusations to several FAA inspectors. These letters came to the attention of the hiring officials considering Bartel's candidacy. Although he was determined to be "a best qualified candidate," Bartel was not selected for the position at the FAA. Bartel was later hired by the FAA for a temporary GS–12 position, despite the fact that he was qualified for a permanent GS–13 position that was open at the same time.

Bartel sued Vincent in his personal capacity, alleging that "Vincent's actions defamed him and resulted in the denial of his right to consideration for reemployment at the GS–13 position on an equal basis with others of equivalent skill and experience." *See Bartel,* 725 F.2d at 1415, 617 F.Supp. at 195. The D.C. Circuit found that Bartel "was wrongfully denied the 'right to be considered for government [employment] in common with all other persons.'" *Bartel,* 725 F.2d at 1415 (*quoting Mosrie,* 718 F.2d at 1161). According to the D.C. Circuit, "the refusal of the FAA, Southern Division to hire Bartel for the same reasons despite his 'best qualified' rating may itself have effectively extinguished a legally recognized and protected interest." *Bartel,* 725 F.2d at 1415. On remand, the district court held that Bartel had "identified a cognizable liberty interest the denial of which would constitute a due process violation." *Bartel,* 617 F.Supp. at 195. It further held that, "[l]oss of *future or present* government employment satisfies" the requirement under *Paul* that the plaintiff "demonstrate that the government's defamation resulted in a harm to some interest beyond reputation." *Id.* 617 F.Supp. at 195 (citing *Paul, Mosrie* and *Doe*).

The facts in this case are remarkably similar to the facts in *Bartel.* Both cases involve an allegation by a former government employee that government defamation caused the foreclosure of an opportunity to obtain a specific future government position. Neither case involves a discharge or termination from the

former government employee's position— both involve "voluntary" departure to avoid the threat of punitive action. There can be little question that if Bartel possessed a liberty interest in seeking the government position at the FAA, then Dr. Siegert possessed a liberty interest in his job at the hospital in Bremerhaven. In fact, Dr. Siegert, if anything, was deprived of substantially "more" of his liberty interest than was Bartel—Dr. Siegert lost not one, but two positions (Bremerhaven and Stuttgart) for which he had already been hired. Moreover, he lost his credentials and he has not been able to obtain another position.

The case law prevailing at the time of the events in question, therefore, plainly provides that defendant's actions violated Dr. Siegert's constitutionally protected liberty interests. Despite the clarity of that case law, defendant urges two separate, but related, narrow constructions of the case law. Both must be rejected as being inconsistent with the holdings in *Doe* and *Bartel.* Defendant asserts that:

> ... a defamation by a government official does not constitute the violation of a liberty interest, protected by the due process clause, unless the person defamed can establish that the defamation accompanied a "loss of government position or a change in legal status." (*Mosrie*) Therefore, to prevail a plaintiff must establish that the defamation was uttered incident to his discharge or incident to an alteration of his legal status, resulting in his loss of some entitlement protected from governmental deprivation by state or federal law.

Relying on that passage, defendant contends that because defendant did not defame Dr. Siegert "incident to his discharge" or to a change in his legal status, there was no violation of plaintiff's liberty interest. In other words, because defendant's defamation of plaintiff allegedly did not occur in conjunction with his discharge/resignation from St. E's, but rather occurred incident to his loss of employment in Germany, plaintiff's liberty interests

were not violated.[8] Under this theory, presumably, no matter what defendant said or wrote about plaintiff *after* he had either left his original job or been discharged, plaintiff would not have recourse to a *Bivens* action. Of course, this reasoning wholly ignores the plain reality that defendant's alleged defamation of Dr. Siegert *caused* his discharge from Bremerhaven and foreclosed his employment opportunity in Stuttgart and most likely elsewhere.

Furthermore, this excessively narrow restatement of the dictum excerpted from *Mosrie* finds no support in the case law. Defendant's view of the law runs directly counter to the D.C. Circuit's square holding in *Bartel* that an individual may have a liberty interest in future government employment. *See supra.* Furthermore, as the D.C. Circuit stated in *Doe,* "an *overwhelming majority* of the circuits have explicitly concluded that a nontenured, at-will government employee states a liberty interest claim after *Paul* when discharged *or foreclosed from future government employment amidst stigmatizing allegations by the government." Doe,* 753 F.2d at 1110, n. 18 (collecting cases) (emphasis added). *See also Conset Corp. v. Community Services Administration,* 655 F.2d 1291 (D.C.Cir.1981) (due process guarantees apply to memorandum calling into question integrity, honesty or business reputation where it effectively denies contractor all *future* government contract work). Either discharge or foreclosure of a future opportunity satisfies the *Paul* requirement for more than mere defamation. All that is necessary is "harm to reputation plus"— the order in which they occur is irrelevant. The two events merely must be closely connected.

Dr. Gilley's letter satisfies this "connectedness" standard. The letter not only was sent incident to his discharge, but *caused*

plaintiff's loss of two jobs in Germany and the alteration of his legal status in the form of his loss of his credentials. There can be no doubt that the defamation by defendant accompanied "a loss of government position or change in legal status." *Mosrie,* 718 F.2d at 1161–62. There is nothing in the case law to support defendant's implied contention that plaintiff's loss of his government position or the alteration in legal status must *precede* the defamation.[9] Such a reading of the cases would simply stand *Paul* and its progeny on their head.

■ Defendant further contends that for plaintiff to have a constitutionally protected liberty interest, the same government officials that defame him must also deny him a legal right. Because defendant in this case claims he has not done anything to directly harm the plaintiff beyond sending the allegedly defamatory letter, he argues he has not caused the plaintiff the deprivation of a liberty interest. Defendant relies on the following dictum from *Mosrie* to support his argument:

> The reaction of others to unfavorable publicity about a person is not, within the meaning of *Paul v. Davis,* a change in legal status imposed by the government ... Financial loss and loss of some employment opportunities do not, therefore, amount to an alteration of a legal right. That must be so even if some of the job opportunities lost are for public jobs ...

*Mosrie,* 718 F.2d at 1162. In short, defendant contends that there is no *Bivens* action in this case because, neither "the defendant [n]or St. Elizabeth's Hospital has taken *any* action, in addition to the defamatory letter, to bar the plaintiff's ability to seek employment." Defendant's Reply at 8.

Defendant misreads the language in *Mosrie.* What *Mosrie* and *Paul* preclude

---

8. Defendant's description of the factual scenario also glosses over the fact that Dr. Gilley sent the allegedly defamatory letter only 23 days after Dr. Siegert resigned from his position at St. E's under the threat of removal.

9. Defendant relies on the following passage from *Mosrie:*

> For a defamation to give rise to a right to procedural due process, it is necessary—we need not say when it is sufficient—that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay.

*Mosrie,* 718 F.2d at 1162. Nothing in that passage implies that the defamation must be preceded by the discharge or demotion.

from the zone of constitutionally protected liberty interests is mere defamation without an attendant loss of a specific government job or an alteration in legal status. What is at issue in this case is not merely "the reaction of others to unfavorable publicity." *Mosrie*, 718 F.2d at 1162. Rather, defendant, a government official, allegedly took deliberate action, (after plaintiff resigned from St. E's), to bar the plaintiff from obtaining the position he was seeking in Germany. Granted, the reaction of third parties to defendant's allegedly defamatory letter was a necessary step in Dr. Siegert's ultimate denial of the positions in Germany. The fact that Dr. Gilley had to work through others to accomplish his goals, however, does not relieve Dr. Gilley from full responsibility for the natural and expected outcome of his actions. From Dr. Siegert's perspective, it is obviously irrelevant that third parties participated in the process whereby he lost his new position. What matters to him is that Dr. Gilley allegedly defamed him, and as a direct and proximate result of that defamation, he lost his job and his professional standing. In addition, he has been unable to obtain another position in his profession.

When the *Harlow* Court redefined the qualified immunity defense it provided an additional basis for defendant to retain his qualified immunity *even if* his actions violated clearly established statutory or constitutional rights. According to the Court:

> If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Harlow*, 457 U.S. at 818–819, 102 S.Ct. at 2738–2739. *See also Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) (qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably be thought consistent with the rights they are alleged to have violated"); *Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed. 2d 139 ("Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard.").

In this case, the defendant does not argue that any exceptional circumstances exist to demonstrate that he reasonably neither knew nor should have known that his actions were violating plaintiff's constitutionally protected right to liberty. Indeed, his alleged actions may constitute the uttering of a false statement in contravention of 18 U.S.C. § 1001.[10] His qualified immunity defense therefore fails and my inquiry is completed by my determination that the applicable law was well established. *See Hobson v. Wilson*, 737 F.2d 1, 27 (D.C.Cir. 1984).

Our inquiry does not end with the identification of a violation of a clearly established constitutional right and the stripping away of defendant's qualified immunity. Deprivation of a liberty interest is cognizable as a violation of the Fifth Amendment only when it is done without due process of law. Here, of course, Dr. Gilley's actions against Dr. Siegert were taken without any process whatsoever. There can be no question that if his allegations are true, plaintiff has been denied due process of law.

■ Defendant contends, however, that plaintiff "has received *or will receive* all the process that is due him" (emphasis added). He argues that the remedies available to plaintiff under the administrative

---

**10.** 18 U.S.C. § 1001 provides:

Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

scheme established by the Civil Service Reform Act of 1978, "preempt a constitutional claim for damages predicated on conduct remediable under that scheme." Defendant's Brief at 10. *See also Bush v. Lucas*, 462 U.S. 367, 387, 103 S.Ct. 2404, 2416, 76 L.Ed.2d 648 (1983). Indeed, defendant identifies several administrative forums where plaintiff might proceed to have his various harms remedied.

It is, however, premature to consider defendant's arguments about the alternative remedies available to plaintiff. Before me are very serious allegations of a deprivation of constitutional rights without due process of law. I must accept these allegations as true for purposes of deciding this motion. In addition, the adverse consequences that befell plaintiff are serious. Dr. Siegert has identified four distinct, but related harms he has suffered as a result of Dr. Gilley's alleged actions: (1) he lost a position he had already obtained in the Bremerhaven hospital; (2) he was foreclosed from an opportunity to work at the hospital in Stuttgart; (3) he was refused credentials at both hospitals and fears being denied credentials elsewhere; concomitantly he has been unable to find "either remotely comparable employment here or abroad" Plaintiff's Opposition to Reconsideration at 2, n. 2.; and (4) his reputation in his professional community was harmed. In addition, of course, he has alleged emotional distress and loss of income because of his inability to obtain a position in his profession. Finally, plaintiff is deeply concerned that unless his record is corrected and measures taken to prevent a repetition of the actions taken against him in this case, these events will haunt him for the rest of his life.

Under these circumstances, I would be trivializing very valuable protections from which this plaintiff is entitled to benefit were I to force this plaintiff to seek relief in another forum. There is no requirement in the law for me to relegate this plaintiff to an administrative forum, if one actually exists, at this early stage of this litigation.

As a result, I find that for this plaintiff there is not available the "substantially adequate remedy through [a] comprehensive federal personnel scheme" which under *Bush* would preclude the implication of a *Bivens* remedy. *Bartel v. F.A.A.*, 617 F.Supp. 190 (D.D.C.1985); *Bush v. Lucas*, 462 U.S. 367, 387–390, 103 S.Ct. 2404, 2416–2418, 76 L.Ed.2d 648 (1983). The process which is due plaintiff must come from this court.

In addition, since I am retaining jurisdiction over plaintiff's *Bivens* claim, it is appropriate for me to exercise pendent jurisdiction over plaintiff's state law claims. These state law claims state separate but parallel grounds for the relief sought in the *Bivens* claim. *See generally United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Many of the operative facts which give rise to Dr. Siegert's constitutional claim against Dr. Gilley are the same as those upon which Dr. Siegert's state law claims rest. Furthermore, the constitutional claim, as discussed above, is a serious one and is not a mere "appendage" to state law claims which comprise "the real body of the case." *Id.* 383 U.S. at 727, 86 S.Ct. at 1139. *See also Bartel v. F.A.A.*, 725 F.2d 1403, 1405, n. 2 (D.C.Cir.1984). Therefore, it is appropriate to hear this entire case in federal court.

In light of my holding regarding defendant's assertion of qualified immunity, I need not address defendant's motion for summary judgment on the basis of his alleged absolute immunity from common law tort claims until after discovery is complete. Because the common law claims closely parallel plaintiff's *Bivens* claim, permitting the common law claims to go forward at least until the completion of discovery should not impose any additional burdens on defendant.

Although I have denied defendant's motion to dismiss and his motion for summary judgment and have rejected his qualified immunity defense, I must emphasize that I have reached no conclusions as to the merits of this case. This Opinion has been based on well pleaded allegations which, although they were subjected to heightened scrutiny, were accepted as true. These allegations may well prove to be

unsubstantiated and this case may well fail. I reluctantly wrote this Opinion because of counsel for the defendant's insistence that I had no right to establish a limited discovery schedule prior to issuing an opinion on the qualified immunity defense.

Obviously, in a case of this sort, knowing the facts is essential to determining the merits. If the information supplied by defendant is true, and the plaintiff is plainly incompetent and derelict, the plaintiff must bear the cross. Furthermore, the defendant must be protected in providing such information if he acted in good faith. To foster the objective of a free exchange of truthful information, however, an individual need not be permitted to intentionally or maliciously provide false information. This defendant should not be permitted to hide behind the laudable public policy of promoting candor in job references. In addition to candor, both the subject and the recipient of information about a potential employee deserve accuracy and truthfulness. Those important values need not be sacrificed to maximize the quantity of information exchanged.

For the foregoing reasons, and upon consideration of the entire record herein, defendant's motion for reconsideration is hereby DENIED and it is

ORDERED that in light of this Opinion, the parties shall proceed to conduct discovery.